UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____

| | |
|---|---|
| **RODNISHA GREENE AND JAMES SAYLES**<br>　　**Plaintiffs** | ) **CIVIL ACTION**<br>) |
| | ) |
| **v.** | ) **COMPLAINT** |
| | ) |
| **THE BARBERINO BROTHERS, INCORPORATED,**<br>**NISSAN MOTOR ACCEPTANCE CORPORATION**<br>**AND FIFTH THIRD BANK.**<br>　　**Defendants** | ) <br>) <br>) **TRIAL BY JURY DEMANDED**<br>) <br>) **JANUARY 29, 2013** |

_____

　　　1.  This is a suit brought by two consumers, James Sayles ("Sayles") and Rodnisha Greene ("Greene"), against Defendants The Barberino Brothers, Incorporated ("Barberino"), Nissan Motor Acceptance Corporation ("NMAC") and Fifth Third Bank ("FTB").  Plaintiffs assert claims against Barberino for violation of the Credit Repair Organizations Act, 15 U.S.C. §1679 *et seq.*, the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.* and also assert pendent claims against Barberino for violation of the Connecticut Unfair Trade Practices Act ("CUPTA"), Conn. Gen. Stat. § 42-110a *et seq.,* fraudulent misrepresentation, and fraud.  NMAC is liable to Plaintiffs as holder of the First Retail Installment Sales Contract (the "First RISC").  FTB is liable to Plaintiffs as holder of the Second Retail Installment Sales Contract (the "Second RISC") and Conn. Gen. Stat § 52-572g.

　　　2.  Plaintiff Greene is a natural person residing in New Haven, Connecticut and is the cousin and goddaughter of Plaintiff Sayles.  Greene is a "consumer" as that term is defined in 15 U.S.C. §§ 1679a(1) and1681a(c), an "applicant" as that term is defined in 15  U.S.C. § 1691a(b) and a "person" as defined by 15 U.S.C. § 1691a(f).

3.   Plaintiff Sayles is a natural person residing in New Haven, Connecticut and is the cousin and godfather of Plaintiff Greene.  Sayles is a "consumer" as that term is defined in 15 U.S.C. §§ 1679a(1) and1681a(c), an "applicant" as that term is defined in 15  U.S.C. § 1691a(b) and a "person" as defined by 15 U.S.C. § 1691a(f).

4.   Defendant Barberino is a Connecticut corporation that operates a motor vehicle dealership in Wallingford, Connecticut.  It is an authorized dealership for Nissan and is a "creditor" as that term is defined in 15 U.S.C. § 1691a(e); a "person" as that term is defined in 15 U.S.C. §§ 1691a(f) and 1681a(b), and is a "credit repair organization" as that term is defined in 15 U.S.C. § 1679a(3).

5.   Defendant NMAC is a California corporation that accepts assignment of RISCs from Nissan dealerships throughout the United States.

6.   FTB is a bank headquartered in Cincinnati, Ohio and is a furnisher of information to consumer reporting agencies as defined by the FCRA, 15 U.S.C. § 1681s-2.

7.   Jurisdiction in this court is proper pursuant to 15 U.S.C. § 1691e, 15 U.S.C. § 1679g, 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

8.   This Court has jurisdiction over the defendants because they regularly conduct business in this state.

9.   Venue in this Court is proper, as the Plaintiffs are residents of Connecticut and the violations that are the subject of this litigation occurred within this state.

## STATEMENT OF FACTS - FIRST TRANSACTION

10.  On or around May 9, 2010, Plaintiffs visited Barberino's dealership to look at a 2006 Mitsubishi Galant that Greene had seen on Barberino's website.

11.  Upon arriving at the dealership, Greene met with Ryan Marks, a Barberino salesman.

12.  Although Greene had seen the Mitsubishi on the website only two days prior, Marks told her that the Mitsubishi was not at the dealership anymore.

13.  Marks took Plaintiffs to a desk to discuss the type of vehicle that they were looking for.  Greene expressed her desire to purchase a Vehicle with low monthly payments, that she had a 1995 Ford Escort to trade in, and that she was looking to pay about $250 per month.  Around this time, Marks asked Greene for a $25 deposit, which she paid.

14.  After looking at a few other vehicles, Greene test drove a 2010 Nissan Sentra (the "First Vehicle").

15.  After test driving the First Vehicle, Plaintiffs and Marks returned to the showroom to process Greene's credit application.

16.  After taking and submitting Greene's credit application, Marks told Greene that her credit was insufficient and that she would need to put more money down and obtain a co-signer in order to finance the First Vehicle.

17.  Barberino never provided Greene with written notice of the reason(s) for the denial of her credit, in violation of ECOA.

18.  At this time, Marks asked for Sayles' credit information.  Sayles provided his social security number and other credit information.  He also told Marks that he was disabled and running a small catering business which occasionally took work, and that he did not have a driver's license.

19. Marks processed Sayles' credit information and told Plaintiffs that, with Sayles as a co-signer, he would be able to obtain financing approval.

20. Also at this time, Marks told Plaintiffs that he would give $1,000 credit for the trade-in vehicle and requested that Plaintiffs pay an additional $1,000 as a down payment.

21. When Greene replied that she could not afford an additional $1,000, Marks agreed to accept an additional $500.

22. At this time, it was requested that Plaintiffs sign papers relating to the purchase of the Vehicle.  They were not given copies of the paperwork they signed that day.

23. Plaintiffs were told that they could not take the First Vehicle home that day, because Barberino could not find a license plate for it.  Plaintiffs left Barberino with their trade in vehicle, expecting to return the next day to pick up the First Vehicle.

24. Plaintiffs contacted Barberino the following day by telephone.  The Barberino representative with whom they spoke informed them that the First Vehicle was not ready yet.

25. After a week of no word from Barberino, Plaintiffs returned to the dealership the following Friday and met with Barberino's finance manager, who identified himself as "Albert".

26. Albert told Plaintiffs that he needed only Sayles' signature.  Because Sayles was not given copies of the previously signed paperwork, he believed that Greene had already signed the necessary documents at the previous meeting, so he agreed to sign the paperwork.

27. Sayles was unable to understand the papers that he was signing but was willing to proceed because of his belief that Greene was the primary purchaser of the Vehicle and a co-signer of the purchase documents.

28. Greene had never purchased a car from a dealership, so she did not think that Albert's request for only Sayles signature was irregular.

29. Unbeknownst to Plaintiffs, the paperwork presented to Sayles was a Retail Installment Sales Contract for the First Vehicle (the "First RISC"), which listed only him as a buyer.

30. Upon viewing the First RISC at the dealership, Greene noticed that the monthly payments of $389.31 were much higher than what she could afford.  Marks told Plaintiffs that they could probably get the payments reduced in a year.  Greene decided to continue the transaction based on Marks' representation and because Sayles offered to assist her with the monthly payments.

31. Also unbeknownst to Plaintiffs, the First RISC included a service contract, GAP insurance, and credit disability insurance.  None of these items were discussed with or requested by Plaintiffs.

32. Furthermore, due to his prior disability, Sayles did not even qualify for credit disability insurance.  Barberino was aware of this fact, because Sayles utilizes a cane and walks only with great difficulty, and he told Barberino employees that he was disabled when they requested his credit information.

33. After Sayles completed the purchase paperwork, Marks told Plaintiffs that Barberino would not be able to register the First Vehicle until Sayles had a Connecticut

identification.  Marks instructed Sayles to go to the department of motor vehicles to obtain a Connecticut state identification.

34.  Barberino put dealer license plates on the First Vehicle, and Greene drove the Vehicle to her home.

35.  Sayles did not obtain his Connecticut identification until mid August 2011; the First Vehicle remained on dealer plates until sometime after mid August 2011.

36.  Months later, Greene received a parking ticket from the city of New Haven. When she went to the town clerk to resolve the ticket, she discovered that the Vehicle had been registered in Sayles' name only.

## STATEMENT OF FACTS - SECOND TRANSACTION

37.  During the summer of 2012, Sayles received a letter from John Mocadlo ("Mocadlo"), Barberino's General Manager , offering him the opportunity to "exchange [the] Vehicle for a new Nissan […] while keeping [the] monthly payments at, near or below" the current monthly payment amount.

38.  Relying on the representations of the letter, Sayles contacted Barberino by phone and spoke with Marks.

39.  Sayles inquired as to whether Barberino could lower the payments on the First Vehicle or get them a less expensive vehicle.  To this, Marks replied "Yeah, we can see if we can get them lowered for you."  Marks also mentioned that Plaintiffs could get a Versa for $250 per month.

40.  When Plaintiffs arrived at Barberino, they were met by a sales representative who identified himself as Nick.  Plaintiffs were told that they should speak with Nick, because Marks was unavailable.

41. Later, Plaintiffs saw Marks, who told them that they could work with Nick, because Marks was training him.  Also at this time, Marks and Plaintiffs discussed the First Vehicle, and Marks told them that it was worth about $13,000.

42. To this, Sayles responded that roughly $19,000 was owed on the First Vehicle.

43. Marks responded that Plaintiffs would only have to pay $2,200 to trade in the Vehicle.

44. Based on these representations, Plaintiffs decided to test drive a 2011 Nissan Altima ("the Second Vehicle").

45. Upon returning to the dealership, Nick told Plaintiffs that they would be able to purchase the Second Vehicle for $285 per month, including taxes and fees.

46. At this time, Sayles told Nick about his interest in trading in the First Vehicle and about his conversation with Marks wherein he was told he would have to pay about $2,200.

47. Nick took Plaintiffs' credit information and returned with a long list of banks. Defendant FTB was on the list, with its name circled.  Nick told Plaintiffs that FTB was the only bank that would be willing to finance the purchase of the Second Vehicle and take back the First Vehicle.

48. Nick also said that Plaintiffs would have to pay about $2,000 to FTB to take the First Vehicle back.

49. Based on these representations, Sayles agreed to purchase the Second Vehicle, and he completed a Retail Installment Sales Contract that was subsequently assigned to FTB for valuable consideration.

50. At the time Sayles signed the Second RISC for the Second Vehicle, Nick told Plaintiffs that the First Vehicle would be picked up by FTB at Barberino.

51. After Sayles signed the RISC, Nick told Plaintiffs that they would have to return to Barberino to pick up the Second Vehicle because Barberino was unable to obtain a license plate for the Second Vehicle.

52. Approximately a week later, Plaintiffs returned to Barberino to pick up the Second Vehicle.

53. When Plaintiffs arrived at the Dealership, Nick told them that FTB had not picked up the First Vehicle and that FTB had refused to pick it up.

54. Nick told Plaintiffs that they would need to take the First Vehicle home with them that day and that they should contact NMAC to arrange to have it picked up.

55. When Plaintiffs refused to take the First Vehicle, Nick told them that someone from Barberino would drop it off at Sayles' home.

56. Approximately two days later, a Barberino representative returned the First Vehicle to Sayles' home.

57. After the First Vehicle was returned to him, Sayles contacted NMAC and explained the situation.

58. The Nissan representative with whom Sayles spoke told him that if NMAC took the First Vehicle back, it would be considered repossession and, in that event, he would owe approximately $7,000.

59. On November 12, 2012, Plaintiff Greene returned the Second Vehicle to the parking lot at Barberino.

60. On November 13, 2012, Plaintiffs' attorney sent written notice to Barberino and to FTB notifying them each that they had revoked acceptance of the Second Vehicle.

61. Barberino and FTB nevertheless have refused to comply with the terms of Plaintiffs' revocation of acceptance and have neglected to return to Plaintiffs the payments they made under the Second RISC.

## CAUSES OF ACTION

62. Through its above-described conduct, Barberino engaged in conduct that was in violation of § 1679(a)(1)(B) of the Credit Repairs Organizations Act.

63. Specifically, Barberino made false statements to NMAC, FTB and perhaps other finance companies in the interest of securing financing for Plaintiffs to purchase the First Vehicle, which statements were untrue and misleading and which Barberino, in the exercise of reasonable care, would have known was untrue and misleading, and said statement was made for the purpose of persuading NMAC and FTB to extend credit to Sayles by accepting assignment of the First RISC and Second RISC, respectively.

64. Barberino is liable to Plaintiffs for their actual damages, punitive damages, and attorney's fees pursuant to §1679g(a).

65. For its failure to provide Greene with written notice of the reason(s) for the denial of her credit within 30 days of her completed credit application, Barberino violated ECOA § 1691(d).

66. For its violation of ECOA, Barberino is liable to Plaintiffs for their damages, punitive damages of up to $10,000, plus attorney's fees and costs.

67. Through its attempts to conceal the GAP insurance and Service Contracts in the First RISC as part of the First Vehicle's purchase price, and through its conduct in knowingly selling Sayles credit disability insurance for which he was ineligible and that would not provide him any benefits, Barberino engaged in Fraud.

68. For Barberino's fraudulent conduct and representations in connection with the First Transaction, Plaintiffs are entitled to their damages and common law punitive damages.

69. Additionally, Barberino's statements, including, but not limited to, its representations regarding the monthly payment amount under the First RISC, its representations to Plaintiffs that they could get out of the First RISC for $2,000 if they purchased the Second Vehicle and allowed FTB to pick up the First Vehicle, were made by its duly authorized employees for whose actions it is liable, and for the purpose of inducing Plaintiffs to enter into the contract to purchase the Second Vehicle and to accept delivery of the Second Vehicle.

70. These representations were made as statements of fact, though they were untrue and known to be untrue by Barberino and its agents and employees who were acting within the scope of their authority and employment when they made the representation, and they were made to induce Plaintiffs to act upon them so as to enter into the Second Contract, and Plaintiffs did act upon the false representations to their injury.

71. The actions of Barberino have caused Plaintiffs damages in that they have been forced to make double car payments, causing them to become past due on the payments for the First Vehicle.  Further, Sayles' credit has been negatively affected,

and Plaintiffs have suffered emotional distress, aggravation and embarrassment as a result of the conduct of Barberino's duly authorized employees.

72.  For Barberino's fraudulent representations regarding the nature of the Second Vehicle transaction, Plaintiffs are entitled to revocation of acceptance of the Second Vehicle as well as their damages.

73.  The aforementioned actions of Barberino constituted unfair trade practices in violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), C.G.S. § 42-110a et seq., in that these actions were immoral, unethical, oppressive and unscrupulous.

74.  The actions of Barberino, as described above, have caused the Plaintiffs to suffer ascertainable losses, including, but not limited to, loss of the benefit of their bargains, additional car payments, and credit damage.  Plaintiffs have also suffered emotional distress, aggravation, and embarrassment because of those actions.

75.  Under the terms of the First RISC, NMAC is liable to Sayles for his claims against Barberino.

76.  Under the terms of the Second RISC, FTB is liable to Sayles for his claims against Barberino.

WHEREFORE, Plaintiffs seek recovery of actual and common law punitive damages for the fraud claims; actual money damages pursuant to 15 U.S.C. §1679g(a)(1), punitive damages pursuant to 15 U.S.C. §1679g(a)(2), reasonable attorney's fees and costs pursuant to 15 U.S.C §1679g(a)(3); actual money damages pursuant to 15 U.S.C. §1691e(a), punitive damages of $10,000 pursuant to 15 U.S.C. §1691e(b), and attorney's fees and costs of this action pursuant to 15 U.S.C. §1691e(d); revocation of acceptance of the vehicle and damages pursuant to C.G.S. § 42a-2-711; actual and  statutory punitive damages pursuant to C.G.S. § 42-110g(a); attorney's fees pursuant to C.G.S. § 42-110g(d); an order from the Court ordering Barberino to cease and desist from engaging in unfair and deceptive trade practices; such other further relief to which Plaintiffs are, at law, or in equity and by statute entitled to against Barberino and such other relief as this Court deems appropriate.


**PLAINTIFFS JAMES SAYLES and**
**RODNISHA GREENE**

By:   _/s/Daniel S. Blinn_____
       Daniel S. Blinn, Fed Bar No. ct02188
       Consumer Law Group, LLC
       35 Cold Spring Rd. Suite 512
       Rocky Hill, CT  06067
       Tel. (860) 571-0408 Fax. (860) 571-7457
       dblinn@consumerlawgroup.com